## Helton et al. v. Franklin.

March 10, 1944.

Arthur Rhorer and W. L. Hammond for appellants.

Henry L. Bryant and W. T. Davis for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

This is an appeal from a judgment of the Bell circuit court rendered in a contest of a local option election, held throughout the Third Magisterial District in Bell County on May 8, 1943. There are seven voting precincts in the district in which the election was held, and the county board of election commissioners certified that there were 339 votes cast in favor of local option in the territory, and 359 against it, thus giving the wets a majority of twenty.

The appellee, a citizen and voter in the magisterial district, filed this contest against the board of election commissioners in which some of the appellants intervened as contestees. A number of grounds were relied

on in the petition as rendering the returns from the seven precincts involved erroneous and incorrect, and when corrected, would show a majority in favor of local option throughout the magisterial district. Such contentions were made against the returns from different precincts of the seven included in the magisterial district, and a vast amount of the testimony as taken by depositions concerns alleged irregularities in other precincts than Cubbage precinct; but on submission all alleged fraud and irregularities concerning other precincts than the latter one were abandoned and by mutual consent the contest was determined on the allegations of the petition with reference to the vote cast in Cubbage precinct.

It was alleged in the petition that in that precinct there were forty votes cast that were illegal and void because the alleged voters did not cast the ballots attributed to them as shown by a certified copy of the stub book of the ballots returned by the election officers to the county board of election commissioners. After the filing of the contest the stub book of that precinct disappeared. Possibly anticipating such a result one of the counsel for contestant had the Clerk to make a copy of it insofar as it showed the name of the voter and the number of the ballot which was cast, and from that list the forty alleged illegal votes were obtained. There is some question made as to the way and manner that fact was proven after the loss of the stub book, since the copy made by the clerk itself became lost; but before it was lost a copy was made of it which was thoroughly proven and which the court admitted as the best proof of the facts. Indeed, it is admitted that the names of the voters constituting the forty challenged votes is correct. As many as two (and possibly three) voters within that list of forty that were challenged, testified that they did cast their ballot in the local option election, but the testimony introduced by appellant in contradiction of at least two of those witnesses, as well as the number of the stub of the ballot they cast, if any, almost conclusively shows that they (two of them) did not attend the election, and consequently did not vote.

Two of the votes in the list of the challenged forty were cast by a voter who did not attend the election at all, although the stub book shows that she voted twice. Some of the challenged voters were shown to have removed from the territory in which the election was held,

and at least one had been dead for about five years. As to the others, witnesses who were there practically throughout the day, including officers of the election, testified that the contested ballots were not cast by the forty persons whose names appeared upon the stub book, since they did not appear and cast a ballot at any time throughout the election.

The polls in the Cubbage precinct did not open until about 8 o'clock A. M. and the election officers, as appointed and designated by the board of election commissioners to hold the election, did not serve as such, but swapped positions during the course of the election. The ballot box from that precinct was not carried by the sheriff and a judge to the county seat for canvassing by the county board of election commissioners, as prescribed by law, and it was not delivered to that body for such purpose until about 8 o'clock P. M.

It would consume much space and time to search out and refer to each witness who testified upon the issue as to whether or not the challenged voters in the Cubbage precinct appeared at the election and cast their ballots. The task is rendered more than ordinarily difficult because the greater portion of the testimony was taken upon issues affecting charges of irregularities concerning other precincts of the magisterial district, but all of which, as we have seen, were abandoned.

The court in its judgment sustained the charge in the petition with reference to the illegal votes cast at the Cubbage precinct which resulted in not only overcoming the certified majority of 20 votes having been cast against local option, but also resulted in a majority of the entire vote of the district being cast for local option. The court, therefore, sustained the contest and declared the drys to be the winners in the election. However, the court did not attempt to purge from the total number of ballots cast in the Cubbage precinct the illegal votes which were found to have been cast in that precinct, because, as the judgment says, the court was unable to find out how, or for which side of the proposition, such votes were cast. In that situation the court threw out entirely the votes cast in the Cubbage precinct which gave the drys a majority of 52 votes in the entire magisterial district by excluding and not counting the thrown out precinct. In reaching its conclusion the court said:

" * * * many of the persons whose names are specifically listed and set out in the petition testified by depositions taken for the plaintiff that they did not appear at the election or vote in that precinct on that date, and many of them testified that they did not know of the election. Several witnesses testified that members of their household for whom votes were cast as though they were present and voted were absent from that precinct and many of them were in other states and had been' for years, and in one instance it appears that one of the supposed voters had been dead for several years. There is no substantial evidence to the contrary, but two of the supposed voters did testify that they voted, but all of the evidence in connection with those two particular voters leaves the fact in considerable doubt as to them to say the least of it. The court finds that that ground of contest is proven by substantial evidence on behalf of the plaintiff, but the court has been unable to conclude with any fair degree of accuracy for whom the ballots may have been cast, but they are substantially more than 20% of the votes cast in that election at that precinct."

Without analyzing the testimony of each witness (for the reasons hereinbefore stated) touching the contest ground as related to the Cubbage precinct (the forty contested ballots challenged therein), we unhesitatingly conclude that the evidence amply supported the finding of the court with reference thereto, and which conclusion is reached with full appreciation of the rule in such cases requiring convincing proof to overcome the presumption raised from the recording of the voter's name on the stub book.

It is argued by counsel for appellants that the court should have purged the returns from the Cubbage precinct of all illegal votes cast, if any, and if they were insufficient to overcome the certified majority of 20 for the wets throughout the district, the judgment should have been rendered in favor of the wets in the entire election. But an analysis of the votes cast at the Cubbage precinct after eliminating 37 of the challenged 40 votes as illegal, leaves only 47 legal votes cast at the Cubbage precinct for both sides of the proposition, instead of 84 as certified by the board of election commissioners. In apportioning those 47 votes the most that could be said in behalf of the wets is that all of the

six dry votes cast in that precinct were cast by ballots voted in the names of those who did not attend at, or vote in, the election, which would still leave the other 31 illegal ballots necessarily cast for the wets or against prohibition, since no one claims that there was an erroneous counting of the ballots by the board of election commissioners that were contained in the ballot box delivered to it, or that they were wrongfully or erroneously counted. The 31 votes so illegally cast not only overcame the majority of 20 throughout the magisterial district certified by the board of election commissioners, but exceeded that number by 11 votes which resulted in the drys carrying the precinct by that number of votes. That analysis is the most favorable one that could possibly be made in behalf of the wets. It is therefore our conclusion that the judgment of the trial court was correct, although it may have been reached by throwing out the entire vote of the Cubbage precinct instead of purging the votes at that precinct in the manner we have pointed out.

The record leaves no room for doubt that skullduggery was engaged in throughout the magisterial district by many advocates of the wet side of the submitted proposition, and which prevailed at the Cubbage precinct. Our experience in handling election contest cases develops an alarming situation in many parts of the Commonwealth which is in utter disregard of the sacred privilege of voting in our democratic form of government, the cornerstone of which is that elections "shall be free and equal," and that all qualified voters shall have the right to cast their ballot as they choose and have it counted as cast. The disregard of that sacred privilege can have no other effect than to corrupt elections, to be followed by consequential corrupt laws and their corrupt administration, which, in turn, eventually destroys the character, or form, of government itself. It is to be hoped that the conditions under which some elections are held will disappear and a perfectly fair expression of the voters shall always prevail. Substantiating what we have said in this paragraph productive of the alarm expressed in elections held in an adjoining county to the instant one, we refer to the cases of Jackson v. Bolt, 292 Ky. 503, 166 S. W. (2d) 531; Osborne v. Com., 296 Ky. 587, 177 S. W. (2d) 896, and cases therein referred to. They also approve the proposition that the casting of fraudulent and illegal votes may be proved by circum-

stantial evidence, and do not require express and direct testimony to establish the fact.

Wherefore, for the reasons stated, the judgment is affirmed; the whole court sitting.